IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

MICHELLE JEAN ROSE,            )   CASE NO.  3:25-CV-01464-JJH
                                        )
        Plaintiff,               )
                                          )   JUDGE JEFFREY J. HELMICK
      vs.                     )   UNITED STATES DISTRICT JUDGE
                                          )
COMMISSIONER OF SOCIAL     )   MAGISTRATE JUDGE
SECURITY,                  )   JONATHAN D. GREENBERG
                                          )
        Defendant.            )   **REPORT AND RECOMMENDATION**
                                            )
                                            )

       Plaintiff, Michelle Rose ("Plaintiff' or "Rose"), challenges the final decision of Defendant, Frank Bisignano,[1] Commissioner of Social Security ("Commissioner"), denying her application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation.  For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be VACATED AND REMANDED for further proceedings consistent with this opinion.

---

[1] On May 7, 2025, Frank Bisignano became the Commissioner of Social Security.

1

### I.  PROCEDURAL HISTORY

In March 2023, Rose filed an application for SSI, alleging a disability onset date of September 6, 2013,[2] and claiming she was disabled due to bipolar disorder, current episode depressed, unspecified trauma and stress related disorder, post-traumatic stress disorder, congestive heart failure, anemia, restless leg syndrome, Chiari malformation, GERD, migraines, and stress/panic episodes.  (Transcript ("Tr.") 14, 91.) The application was denied initially and upon reconsideration, and Rose requested a hearing before an administrative law judge ("ALJ").  (*Id.* at 14.)

On June 4, 2024, an ALJ held a hearing, during which Rose, represented by counsel, Rose's mother, and an impartial vocational expert ("VE") testified.  (*Id.*)  On June 20, 2024, the ALJ issued a written decision finding Rose was not disabled. (*Id.* at 14-29.)  The ALJ's decision became final on May 30, 2025, when the Appeals Council declined further review.  (*Id.* at 1-6.)

On July 14, 2025, Rose filed her Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 7-9.) Rose asserts the following assignments of error:

(1)    The ALJ failed to support his RFC with substantial evidence when he applied the wrong standard of review.

(2)    The ALJ erred when he failed to support his conclusions or discuss supportability and consistency when he evaluated the opinions of the treating sources.

(Doc. No. 7.)

---

[2] At the hearing, Rose amended her alleged disability onset date to March 13, 2023, the date of application. (Transcript ("Tr.") 15.)

## II.   EVIDENCE

### A.   Personal and Vocational Evidence

Rose was born in March 1985 and was 39 years-old at the time of her administrative hearing (Tr. 14, 28), making her a "younger" person under Social Security regulations.  *See* 20 C.F.R. § 416.963(c).  She has at least a high school education.  (Tr. 28.)  She has past relevant work as a cashier.  (*Id*.)

### B.   Relevant Medical Evidence[3]

On June 24, 2022, Rose went to the emergency room with increased depression and suicidal thoughts with a plan to overdose on medication.  (*Id.* at 2037-38.)  Rose reported loneliness and "intense anxiety" from social situations.  (*Id.* at 2038.)  Social situations caused panic with increased heart rate, sweating, and feelings of doom.  (*Id.*)  Rose reported feeling down and depressed all day almost every day for the past few weeks, as well as experiencing anhedonia, low energy and motivation, and decreased concentration.  (*Id.*) Rose endorsed feelings of extreme hopelessness and helplessness.  (*Id.*)  Rusheeth Thummalapally, M.D., admitted Rose for in-patient treatment and noted that Rose was in poor condition.  (*Id.* at 2037, 2039.)  Rose improved after a few days. (*Id.* at 2039.)  On June 28, 2022, Dr. Thummalapally discharged Rose home in stable condition.  (*Id.*)  Rose's diagnosis consisted of bipolar I disorder, most recent episode depressed, severe without psychotic features.  (*Id.* at 2038.)

On August 31, 2022, Rose saw Cheryl McGarry, APRN-CNP, regarding her chronic migraine headaches, nonepileptic seizures, and Chiari malformation type I.  (*Id.* at 1954-55.)  Rose reported improvement of her headaches and endorsed infrequent headaches.  (*Id.* at 1955.)  McGarry noted normal neurologic findings on examination, including normal muscle bulk and tone, full strength, intact sensation,

---

[3] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

and normal gait. (*Id.* at 1958.) McGarry noted Rose's chronic migraines were well controlled and started Rose on Maxalt for abortive therapy. (*Id.* at 1959.)

An echocardiogram conducted on September 23, 2022 revealed an estimated ejection fraction of 55-60%, moderate regurgitation in the aortic valve, and mild regurgitation in the mitral valve. (*Id.* at 688.)

A CT angiography of the abdomen and pelvis conducted on September 30, 2022 revealed a "short dissection in the superior mesenteric artery" and "a 1.2 cm thrombus in the superior mesenteric artery." (*Id.* at 787.)

On October 7, 2022, Rose underwent surgery for an aortic valve replacement, mitral and tricuspid valve repair, and placement of a permanent pacemaker. (*Id.* at 1322.)

On January 27, 2023, Rose went to the emergency room and reported daily suicidal thoughts that had worsened over the past few days. (*Id.* at 1861.) Rose denied medication compliance, telling Wesley Martus, M.D., that she was taking them intermittently. (*Id.*) Rose reported using medical marijuana. (*Id.*) She told Dr. Martus she had been sleeping much more and endorsed thoughts of dying and feeling unsafe at home. (*Id.*) Rose asked to be admitted for treatment. (*Id.*) On examination, Dr. Martus found normal behavior and judgment, as well as a calm and cooperative demeanor. (*Id.* at 1864.) Dr. Martus admitted Rose for treatment. (*Id.* at 1865.) Treatment providers discharged Rose on February 3, 2023. (*Id.* at 1947.) On examination at discharge, treatment providers found cooperative and attentive attitude, good eye contact, normal speech, euthymic mood, full range of affect, linear, goal-directed, and coherent thought processes, and fair judgment and insight. (*Id.* at 1949-50.)

On February 8, 2023, Rose saw Misty Kammeyer, LSW, for a diagnostic assessment. (*Id.* at 3740, 3749.) Rose endorsed periods of "abnormally and persistently" elevated mood and goal-directed behavior lasting one to two weeks where she felt a reduced need for sleep, was more talkative, and experienced flight of ideas and distractibility. (*Id.* at 3740.) Rose also endorsed periods of depressed mood, loss of energy,

recurrent suicidal thoughts, reduced concentration, and feelings of worthlessness lasting two weeks to a month. (*Id.*) On examination, Kammeyer found good grooming and hygiene, good eye contact, normal speech, euthymic mood, broad affect, logical thought processes, and good insight and judgment. (*Id.* at 3740-41.) Kammeyer diagnosed Rose with bipolar disorder, current episode depressed, mild, and reaction to severe stress, unspecified. (*Id.* at 3749.)

On March 13, 2023, Rose saw Shirley Vogelsong, QMHS, requesting help filing for disability. (*Id.* at 3754-55.) Rose reported struggling to work a few hours two days a week as a dishwasher. (*Id.* at 3754.) Rose's mother told Vogelsong Rose's anxiety about leaving the house to go to work could start as early as the day before her shift. (*Id.*) Rose's mother stated Rose often called her from work. (*Id.*) Rose reported a friend stayed with her at work recently so Rose could finish her shift. (*Id.*) Rose thought she was unable to continue to work because of her "overwhelming anxiety." (*Id.*) On examination, Vogelsong found Rose anxious, tearful at times, and vague, with poor memory recall. (*Id.*) Vogelsong further found Rose "easily overwhelmed" and Rose misunderstood information. (*Id.*)

On April 10, 2023, Rose saw Adam Peckinpaugh, PA, for evaluation due to her history of superior mesenteric arterial dissection with distal occlusion. (*Id.* at 3441.) Rose reported feeling "'pretty good'" and denied abdominal pain, loss of appetite, chest pain, numbness or weakness, swelling of the extremities, leg pain, and shortness of breath. (*Id.*) Peckinpaugh noted normal examination findings. (*Id.* at 3443.)

On May 10, 2023, Rose's mother helped Rose complete an Adult Function Report. (*Id.* at 252-259.) Rose reported she could not work because of her "debilitating anxiety." (*Id.* at 252.) She could not drive, function around other people, or go anywhere without her mom. (*Id.*) She cried a lot. (*Id.*) Her mom reminded her to shower and do the dishes and laundry. (*Id.* at 253-54.) She only went outside when she had to and when her mom was with her. (*Id.* at 255.) She could not go out alone. (*Id.*) She could pay bills, count change, handle a savings account, and use a checkbook/money order. (*Id.*) She was too nervous and

scared to talk to others.  (*Id.* at 256.)  She could walk for half a mile before needing to rest for 15-20 minutes.  (*Id.* at 257.)  She could pay attention for 15-20 minutes before her mind started to wander.  (*Id.*)  She could follow a simple recipe.  (*Id.*)  She could not be given more than one to two things to do with spoken instructions.  (*Id.*)  She could not handle stress.  (*Id.* at 258.)  She could handle small changes to her routine but struggled to handle large changes.  (*Id.*)

On May 15, 2023, Rose saw Lincoln Darla, M.D., for a neurology consultation regarding her migraines.  (*Id.* at 3884.)  Rose reported she had stopped taking Aimovig once her headaches improved, and since stopping the medication her migraines had returned.  (*Id.* at 3884-85.)  Rose endorsed migraines that lasted from 5 hours to a day twice a week with associated photophobia and phonophobia.  (*Id.* at 3885.)  Dr. Darla noted normal examination findings.  (*Id.* at 3886-87.)  Dr. Darla restarted Rose on Aimovig and prescribed Maxalt for abortive attacks.  (*Id.* at 3888.)

On May 26, 2023, Rose saw Kadori Ngirabakunzi, CNP, for a psychiatric evaluation and reported she was unsure why she was there.  (*Id.* at 3957, 3966.)  Rose endorsed anxiety that was so bad she could not work, and she could hardly leave her house.  (*Id.* at 3957.)  Rose also reported occasional depression that included feeling helpless and suicidal thoughts.  (*Id.*)  She rated her depression as a 2/10 on average.  (*Id.*)  Rose told Ngirabakunzi that her anxiety started when she woke up.  (*Id.*)  She worried about what she was going to do each day and often called her mom for help.  (*Id.*)  On examination, Ngirabakunzi found Rose appropriately dressed and groomed with normal speech, anxious mood and affect, good concentration and attention span, racing thoughts, coherent and goal-directed thought process, and fair insight and judgment.  (*Id.* at 3960-61.)  Ngirabakunzi noted Rose was "extremely anxious."  (*Id.* at 3960.)  Rose's diagnosis consisted of bipolar disorder, current episode depressed, mild.  (*Id.* at 3962.)  Ngirabakunzi ordered Genesight testing and directed Rose to follow up in 8-10 weeks.  (*Id.* at 3963.)

On July 5, 2023, Rose saw Elizabeth Ruh, LPCC-S, for counseling.  (*Id.* at 4018-19.)  Ruh noted Rose was "very anxious" and she spent time during the session calming Rose down.  (*Id.* at 4018.)  On examination, Ruh found Rose anxious and tearful throughout the appointment.  (*Id.*)

On July 18, 2023, Rose saw Dr. Darla for follow up and reported that Maxalt had helped her headaches.  (*Id.* at 3972.)  Dr. Darla noted insurance had rejected Aimovig.  (*Id.*)  Rose felt she did not need Aimovig; she took Maxalt at least four times a month when her headaches began, and it stopped the headaches.  (*Id.*)  Dr. Darla noted Rose was "in high spirits today and relieved."  (*Id.*)  An examination revealed normal findings.  (*Id.* at 3974-75.)

On July 19, 2023, Rose saw Ruh for follow up and was "crying and highly anxious" because she had gotten a rejection letter from Social Security.  (*Id.* at 4020.)  Ruh spent time during the session calming Rose down.  (*Id.*)

On September 20, 2023, Rose saw Ruh for follow up and was "highly anxious."  (*Id.* at 4175.)  Rose reported increased anxiety and having nightmares about past trauma.  (*Id.*)  Ruh spent time during the session calming Rose down.  (*Id.*)

On October 18, 2023, Rose saw Colleen Taylor, CNP, to establish care and reported Caplyta was working "really well."  (*Id.* at 4052, 4063.)  Rose told Taylor her mood was "pretty good."  (*Id.* at 4052.)  She thought she might be depressed, but she did not want to take another medication.  (*Id.*)  She reported improved anxiety, although it continued, low energy, and "alright" concentration.  (*Id.*)  On examination, Taylor found Rose appropriately dressed and groomed, with normal speech, anxious mood and affect, good concentration and attention span, coherent and goal-directed thought process, and fair insight and judgment.  (*Id.* at 4054-56.)

On October 27, 2023, Rose saw Jami Baer, LISW-S, for follow up and reported her depression was under control and denied current depression.  (*Id.* at 4143, 4146.)  She told Baer she had started Caplyta and

was doing well.  (*Id.* at 4143.)  On examination, Baer found euthymic mood, congruent affect, open attitude, and normal thought content.  (*Id.* at 4144.)

On November 8, 2023, Rose saw Ruh for follow up.  (*Id.* at 4177.)  Ruh noted Rose "presented with high anxiety" and that Rose was crying because she was worried about disability.  (*Id.*)  Ruh spent time during the session calming Rose down.  (*Id.*)

Rose underwent psychological testing in October and November 2023.  (*Id.* at 4078.)  Rose reported difficulty completing multistep tasks in the work setting and that she became overwhelmed and fell behind.  (*Id.* at 4079.)  She often called off work because of her anxiety.  (*Id.*)  She socialized with some friends online, but she had a hard time maintaining conversation and often felt uncomfortable around others.  (*Id.*)  She followed a set schedule and struggled to adjust to changes in her routine.  (*Id.*)  She often became tearful when her routine changed.  (*Id.*)  On examination, Jon Sattler, M.S., found Rose well-groomed and fully oriented with adequate eye contact and coherent speech.  (*Id.* at 4080.)  While Rose first presented as anxious, and she became tearful at times, once she got used to the setting she presented as "euthymic with congruent effect."  (*Id.*)  Rose cooperated during testing, put forth good effort, and did not require any breaks.  (*Id.*)  Rose's WASI-II test results indicated average intellectual reasoning.  (*Id.* at 4082.)  Rose's diagnoses consisted of generalized anxiety disorder with panic attacks, social anxiety disorder, bipolar I disorder, with current depressed episode, posttraumatic stress disorder, and obsessive-compulsive disorder with fair insight.  (*Id.* at 4083.)

On December 4, 2023, Rose saw Ruh for follow up.  (*Id.* at 4179.)  Ruh noted Rose was "highly anxious" and spent time during the session calming Rose down.  (*Id.*)

On December 12, 2023, Anthony Atkins, M.D., wrote a letter and opined that Rose had "numerous physical and mental health conditions that prevent her from working."  (*Id.* at 4051.)

On January 16, 2024, Rose saw Ruh for follow up and discussed her anxiety when out in public. (*Id.* at 4183.)   On examination, Ruh found Rose had an anxious mood and affect and noted some improvement since their last session.  (*Id.* at 4183-84.)

On March 1, 2024, Rose saw Nicole Covell, LISW-S, and reported continued anxiety, although it was more manageable.  (*Id.* at 4103.)  On examination, Covell found normal speech, euthymic mood, open congruent affect, and open attitude.  (*Id.* at 4105.)

On March 4, 2024, Rose saw Baer for follow up and reported that her medications were helping and her energy level was good.  (*Id.* at 4098-99, 4102.)  On examination, Baer found appropriate eye contact, open attitude, and normal thought process.  (*Id.* at 4100.)

On March 16, 2024, Rose's friend, Aaron Brown, completed a Third Party Adult Function Report. (*Id.* at 670-77). Brown reported that he saw Rose a few days a week.  (*Id.* at 670.)  He explained that Rose lacked people skills, motor skills, and problem-solving skills, did not follow directions well, and exhibited irrational thoughts, antisocial behavior, and anxiety.  (*Id.*)  Brown reported Rose "lived in her pajamas" unless she had to go somewhere, and it was not unusual for Rose to shower only once every three to four days.  (*Id.* at 671.)

On May 15, 2024, Rose saw CNP Taylor for medication management and reported a stable mood on Caplyta.  (*Id.* at 4160.)  However, Rose told Taylor she was experiencing side effects on Trintellix and wanted to take something else for her mood.  (*Id.*)  Rose endorsed stable anxiety, continued obsessive thoughts, and "alright concentration," although she "talk[ed] a lot in her head," which made it difficult for her to concentrate.  (*Id.*)  On examination, Taylor found Rose appropriately dressed and groomed with normal speech, anxious mood, anxious and labile affect, good concentration and attention span, coherent and goal-directed thought process, and fair judgment and insight.  (*Id.* at 4162-64.)  Taylor started Rose on Celexa.  (*Id.* at 4168.)

On May 30, 2024, Taylor completed a Mental Medical Source Statement.  (*Id.* at 4172-74.)  Taylor opined Rose could maintain attention for a two-hour segment and be aware of normal work hazards and take appropriate precaution 80% of the time.  (*Id.* at 4173.)  Taylor further opined Rose could sustain an ordinary routine for eight hours a day, five days a week, without special/extra supervision, deal appropriately with normal work stress, and perform at a consistent pace without an unreasonable number and length of rest periods less than 80% of the time.  (*Id.*)  Taylor marked "unknown" as to Rose's ability to maintain regular attendance and be punctual within customary tolerances, respond appropriately to changes in a routine work setting, and complete a normal workday and workweek without interruption from psychologically based symptoms.  (*Id.*)  Taylor also marked "unknown" regarding how much time Rose would likely be off task.  (*Id.* at 4174.)  Taylor opined Rose would miss work about four days a month.  (*Id.* at 4173.)

On June 11, 2024, Dr. Atkins completed another letter opining that Rose was unable to work in a competitive work environment because of her mental health issues and medication side effects.  (*Id.* at 4202.)

That same day, Dr. Atkins completed a Medical Source Statement.  (*Id.* at 4199-4201.)  Dr. Atkins opined that Rose could sit and stand/walk for less than two hours in an eight-hour workday.  (*Id.* at 4200.)  She could frequently lift less than 10 pounds and rarely lift 10 and 20 lbs.  (*Id.*)  She would be off-task 25% or more of the workday.  (*Id.*)  Dr. Atkins opined Rose was unable to: maintain regular attendance and be punctual within customary tolerances; respond appropriately to changes in a routine work setting; complete a normal workday and workweek without interruptions from psychologically based symptoms; respon appropriately to brief and superficial contact with coworkers and the public; accept instructions and respond appropriately to criticism from supervisors, and sustain an ordinary routine for eight hours a day, five days a week, without special supervision.  (*Id.*)  Rose would sometimes need to take unscheduled breaks during

10

the workday. (*Id.*) She would be absent more than four days per month. (*Id.* at 4201.) Dr. Atkins again opined Rose was unable to work. (*Id.*)

**C.      State Agency Reports**

**1.          Mental Impairments**

On March 31, 2023, Matthew Wong, Ph.D., reviewed the file and opined that Rose had moderate limitations in her ability to understand, remember, or apply information, interact with others, concentrate, persist, or maintain pace, and adapt or manage herself. (*Id.* at 97-98.) Dr. Wong explained that the psychiatric review technique "is an adoption of the ALJ PRT dated 3/11/2019. It is being adopted under AR 98-4 Drummond Ruling. There is new evidence to consider, but the evidence is not material to result in a different finding from ALJ decision." (*Id.* at 98.) Dr. Wong opined that the "MRFC is an adoption of the ALJ MRFC dated 3/11/2019. It is being adopted under AR 98-4 Drummond Ruling." (*Id.* at 99.) The March 11, 2019 MRFC limited Rose to "simple tasks in a routine work setting but not at a production rate pace, for example, no assembly line work"; "occasional interaction with supervisors and coworkers"; and "no interaction with the general public." (*Id.*)

On October 14, 2023, on reconsideration, psychologist Jennifer Swain affirmed Dr. Wong's findings. (*Id.* at 106.)

**2.          Physical Impairments**

On May 17, 2023, Mehr Siddiqui, M.D., reviewed the file and opined:

> The RFC is an adoption of the ALJ RFC dated 3/11/2019. It is being adopted under AR 98-4 Drummond Ruling.
>
> 3/11/2019 ALJ RFC: light work; occasionally climb ramps/stairs; never climb l/r/s; avoid workplace hazards such as unprotected heights or moving mechanical parts[.]

(*Id.* at 99.)

11

On October 5, 2023, on reconsideration, Elizabeth Das, M.D., reviewed the file and opined Rose could occasionally lift and/or carry 20 pounds and frequently lift and/or carry 10 pounds.  (*Id.* at 107-09.)  Rose could stand and/or walk for a total of about six hours in an eight-hour workday.  (*Id.* at 108.)  She could sit for about six hours in an eight-hour workday.  (*Id.*)  Dr. Das opined Rose could occasionally climb ramps/stairs but never climb ladders, ropes, or scaffolds.  (*Id.*)  She could occasionally stoop, crouch, and crawl.  (*Id.*)  Her ability to balance and kneel was unlimited.  (*Id.*)  She must avoid even moderate exposure to hazards.  (*Id.*)

**D.      Hearing Testimony**

During the June 4, 2024 hearing, Rose testified to the following:

- She lives with her mother and nine-year-old son.  (*Id.* at 40.)  She holds a driver's license but does not drive because of her anxiety.  (*Id.* at 41.)  She stopped driving about two years ago.  (*Id.*)

- She cannot work because leaving her house often times causes her to "freak[] out."  (*Id.* at 42.)  She starts crying and wants to vomit.  (*Id.*)  She fears being away from her home and is afraid someone is going to take her.  (*Id.*)  She also gets migraines.  (*Id.*)  Her hand stops working at times.  (*Id.*)  Sometimes she cannot speak.  (*Id.*)

- She can walk for about 10 minutes before she gets out of breath, her back hurts, and she gets worn out.  (*Id.*)  She can stand for about six or seven minutes before she gets out of breath, her back hurts, and she gets worn out.  (*Id.*)  She has bad balance caused by her Chiari malformation.  (*Id.*)  She falls over a lot.  (*Id.* at 43.)  She has no limit on her ability to sit.  (*Id.* at 44.)

- Her mom sits outside with her while she does yard work.  (*Id.* at 43-44.)  Her mother reminds her to shower.  (*Id.* at 44.)  She only goes shopping with her mother.  (*Id.* at 47.)  Her mom has to give her "pep talks" before going to the store.  (*Id.*)  She will go in the store if they're only getting a few things so they can grab them and get in a checkout line that isn't too long so they can leave the store before her anxiety gets too bad.  (*Id.*)  They have to leave the store because of her anxiety twice a month.  (*Id.*)

- She sometimes naps during the day.  (*Id.* at 44.)  When she is depressed, she takes naps because she has a hard time staying awake.  (*Id.*)  She naps for two and a half hours four or five days a week.  (*Id.*)  She only gets dressed if she has to leave the house.  (*Id.* at 48.)  She doesn't talk to people well.  (*Id.*)  She can participate in a small family

12

function, but if it's a big event she will not go. (*Id.* at 49.) She gets crying spells twice a week. (*Id.* at 51.) She cried more often when she was working. (*Id.*)

- Her OCD prevents her from cooking because she cannot handle unequal lines when cutting things. (*Id.* at 45.) She can sweep the floor and do dishes and laundry. (*Id.*) She has been trying to paint. (*Id.*) She used to knit, but it got too overwhelming. (*Id.* at 46.)

- She helps her nine-year-old son with his homework with her mother's assistance. (*Id.* at 49.) She doesn't go to any of her son's school activities. (*Id.*)

- Her friend Aaron Brown has helped her get through the grocery store before. (*Id.*) She felt unsafe at her job, and he used to sit at her job with her. (*Id.*) He would drive her to her job sometimes. (*Id.* at 50.) If he wasn't at her job, she would stand in the corner at the back of the store and cry because she was overwhelmed and wanted to go home. (*Id.*) She was working three hours a day three to four days a week. (*Id.*) She was hospitalized for her mental health while she was working there. (*Id.*)

- She sees a therapist every other week. (*Id.* at 51.) She wants to go every week, but her therapist doesn't have an opening in her schedule for her to do so. (*Id.*)

During the June 4, 2024 hearing, Rose's mother testified to the following:

- Rose has lived with her since 2022 when she had her last open-heart surgery. (*Id.* at 53.) Rose had "major problems" living on her own. (*Id.* at 54.) She could not care for her son. (*Id.*) Her son was out of control, and Rose was depressed and stayed in bed. (*Id.*) She wasn't taking care of herself or her son. (*Id.*) All she could do was sit and cry in bed. (*Id.*) Rose is doing better now. (*Id.*) Rose's mother still has to tell her to shower or fix her son a sandwich. (*Id.* at 54-55.) Rose's mother schedules all of Rose's doctor's appointments and takes her to all of them. (*Id.* at 55.) She makes sure Rose is clean and prepared for her appointments. (*Id.*) Rose gets very anxious in the car. (*Id.*)

- Rose was living with her mother when Rose was working at Denny's. (*Id.*) Rose was trying very hard at her job. (*Id.* at 56.) She had four-hour shifts. (*Id.*) Rose struggled getting out the door to be somewhere on time. (*Id.*) Rose could not even finish the dishes at home; she does some and then takes a break. (*Id.*) It was very hard for Rose to be out of her comfort zone in her house. (*Id.*) By the time she got to work, Rose could not function or concentrate. (*Id.*) She could not think of what to do, so she just sat and cried. (*Id.*)

The ALJ found that Rose had past work as a cashier. (*Id.* at 41.) The ALJ then posed the following hypothetical question:

> Assume that a hypothetical individual of the Claimant's age, education, and work experience has the residual functional capacity for work at the light

exertional level.  Postural limitations are no climbing of ladders, ropes, or scaffolds.  Occasional climbing of ramps and stairs.  Occasional stooping, crouching, and crawling.  Environmental limitations to avoid all exposure to moving mechanical parts and high exposed places.  The hypothetical individual can understand, remember, and carry out simple instructions for work not requiring a specific production rate such as assembly line work, nor work requiring hourly quotas.  Capable of using judgment to make simple work-related decisions with occasional changes in a routine work setting.  No interaction with the general public.  Occasional interaction with coworkers and supervisors.  Mr. Burkhammer, would a hypothetical individual with that residual functional capacity be able to perform the identified past relevant work?

(*Id.* at 59.)

The VE testified the hypothetical individual would not be able to perform Rose's past work as a cashier.  (*Id.*)  The VE further testified the hypothetical individual would be able to perform other representative jobs in the economy, such as housekeeping cleaner, mail clerk, and office helper.  (*Id.* at 59-60.)

The ALJ modified the hypothetical to allow for a sit/stand option where the hypothetical individual could "sit or stand alternating positions for one or two minutes in the immediate vicinity of the workstation," "[n]o more frequently than every 30 minutes while remaining on task for at least 90% of the work period." (*Id.* at 60.)  In response to a question from the VE, the ALJ clarified that the hypothetical individual can sit or stand and alternate positions.  (*Id.*)  It would take one to two minutes to change position.  (*Id.*)  The VE testified there would be sedentary jobs the hypothetical individual could perform.  (*Id.* at 60-61.)  The VE identified representative jobs in the economy at the sedentary level of exertion, such as document preparer, sorter, and stuffer.  (*Id.* at 61.)

14

### III. STANDARD FOR DISABILITY

A disabled claimant may be entitled to receive SSI benefits. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must meet certain income and resource limitations. 20 C.F.R. §§ 416.1100, 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. § 416.920(a)(4). *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that they are not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. § 416.920(b). Second, the claimant must show that they suffer from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. § 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. § 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent the claimant from doing their past relevant work, the claimant is not disabled. 20 C.F.R. §§ 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent the claimant from doing their past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. § 416.920(g).

### IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant has not engaged in substantial gainful activity since March 13, 2023, the application date (20 CFR 416.971 *et seq.*).

2.    The claimant has the following severe impairments: major depressive disorder /bipolar disorder; post-traumatic stress disorder / unspecified trauma and stress related disorder; Chiari malformation; migraines / headaches; a history of aortic stenosis / diseases of aortic valve / aortic valve replacements / mitral valve repair / tricuspid valve repair; borderline personality disorder; seizure disorder; congestive heart failure, pacemaker implant / mesenteric ischemia; and anxiety / obsessive compulsive disorder /stress / panic. (20 CFR 416.920(c)).

3.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except: Postural limitations of no climbing of ladders, ropes, or scaffolds. Occasional climbing of ramps and stairs. Occasional stooping, crouching, and crawling. Environmental limitations to avoid all exposure to moving mechanical parts and high exposed places. Can understand, remember and carry out simple instructions, for work not requiring a specific production rate, such as assembly line work, nor work requiring hourly quotas. Capable of using judgement to make simple work-related decisions, with occasional changes in a routine work setting. No interaction with the general public. Occasional interaction with coworkers, and supervisors.

5.    The claimant is unable to perform any past relevant work (20 CFR 416.965).

6.    The claimant was born on March **, 1985 and was 38 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7.    The claimant has at least a high school education (20 CFR 416.964).

8.    Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 416.968).

9.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969a).

10.    The claimant has not been under a disability, as defined in the Social Security Act, since March 13, 2023, the date the application was filed (20 CFR 416.920(g)).

(Tr. 17-29.)

16

## V.  STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)."  *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.").  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

As part of her assignments of error, Rose argues that the ALJ "failed to consider any of the new medical evidence when setting forth his opined limitations." (Doc. No. 7 at 11.)  Such evidence included two hospitalizations for mental health issues. (*Id.* at 13.)

The Commissioner responds that "[e]ven a cursory review of the decision shows that the ALJ discussed the medical evidence subsequent to the 2019 ALJ decision." (Doc. No. 8 at 10) (citations and footnote omitted).  In fact, the Commissioner argues that the ALJ "thoroughly discussed evidence submitted after the 2019 decision." (*Id.*)

18

In her reply brief, Rose argues that while "the ALJ cited to evidence lending credence to his determination," the ALJ failed to discuss contrary evidence which supported the opinions of Rose's treating source, including Rose's hospitalizations for mental health issues.  (Doc. No. 9 at 2-3.)

The RFC determination sets out an individual's work-related abilities despite his or her limitations. *See* 20 C.F.R. § 416.945(a)(1).  A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner.  *See* 20 C.F.R. § 416.927(d)(2).  An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner."  *See* 20 C.F.R. § 416.927(d)(3).  As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all the relevant evidence (20 C.F.R. § 416.946(c)) and must consider all of a claimant's medically determinable impairments, both individually and in combination.  *See* SSR 96–8p, 1996 WL 374184 (SSA July 2, 1996).

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis."  *Fleischer*, 774 F. Supp. 2d at 880 (citing *Bryan v. Comm'r of Soc. Sec.*, 383 F. App'x 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")).  *See also* SSR 96-8p, 1996 WL 374184, at *7 (SSA July 2, 1996) ("The RFC assessment must always consider and address medical source opinions.  If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.").  While the RFC is for the ALJ to determine, the claimant bears the burden of establishing the impairments that determine her RFC.  *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

It is well-established there is no requirement that the ALJ discuss each piece of evidence or limitation considered.  *See, e.g., Conner v. Comm'r*, 658 F. App'x 248, 254 (6th Cir. 2016) (citing *Thacker v. Comm'r*

99 F. App'x 661, 665 (6th Cir. May 21, 2004) (finding an ALJ need not discuss every piece of evidence in the record); *Arthur v. Colvin*, No. 3:16CV765, 2017 WL 784563, at *14 (N.D. Ohio Feb. 28, 2017) (*accord*). However, courts have not hesitated to remand where an ALJ selectively includes only those portions of the medical evidence that places a claimant in a capable light and fails to acknowledge evidence that potentially supports a finding of disability. *See e.g., Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir. 2014) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *Germany–Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (finding error where the ALJ was "selective in parsing the various medical reports"). *See also Ackles v. Colvin*, No. 3:14cv00249, 2015 WL 1757474, at *6 (S.D. Ohio April 17, 2015) ("The ALJ did not mention this objective evidence and erred by selectively including only the portions of the medical evidence that placed Plaintiff in a capable light."); *Smith v. Comm'r of Soc. Sec.*, No. 1:11-CV-2313, 2013 WL 943874, at *6 (N.D. Ohio March 11, 2013) ("It is generally recognized that an ALJ 'may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding.'"); *Johnson v. Comm'r of Soc. Sec.*, No. 2:16-cv-172, 2016 WL 7208783, at *4 (S.D. Ohio Dec. 13, 2016) ("This Court has not hesitated to remand cases where the ALJ engaged in a very selective review of the record and significantly mischaracterized the treatment notes.").

A review of the ALJ's decision reveals no mention of Rose's two hospitalizations, once in 2022 and once in 2023, for increased depression and suicidal thoughts. (Tr. 14-29.) Her hospitalization in 2022 lasted five days, while her hospitalization in 2023 lasted eight days. (*Id.* at 1861-1954, 2037-39.) Rose testified that one of these hospitalizations occurred when she was working. (*Id.* at 50.) As explained in detail above, if relevant evidence is not mentioned, the Court cannot discern whether the ALJ discounted or overlooked the evidence. *Shrader*, 2012 WL 5383120, at *6. Nor may an ALJ overlook or ignore contrary lines of evidence. Therefore, this matter must be reversed and remanded.

As the undersigned recommends remand on these grounds, and in the interest of judicial economy, the undersigned does not reach Rose's other arguments presented in her assignments of error.

## VII.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be VACATED AND REMANDED for further proceedings consistent with this opinion.

Date: April 27, 2026

        *s/ Jonathan Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *Berkshire v. Beauvais*, 928 F.3d 520, 530-31 (6th Cir. 2019).**